# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

RYAN MICHAEL MORRISON,

Defendant-Appellant.

UNPUBLISHED
December 18, 2018

No. 339155
Ingham Circuit Court
LC No. 16-000551-FH

Before: SWARTZLE, P.J., and SAWYER and RONAYNE KRAUSE, JJ.

PER CURIAM.

Defendant appeals as of right his convictions of second-degree child abuse, MCL 750.136b(3), and assault by strangulation, MCL 750.84(1)(b), against AW, a minor child. We affirm.

## I. BACKGROUND

In late January 2016, at approximately 8:30 p.m., AW and her sister CW were dropped off at the Dorsey School in Lansing, where their mother, MW, had been attending vocational courses. The children were crying, scared, and emotionally distraught when BW, their stepmother, dropped them off. BW had been providing babysitting services for AW and CW at her home—where defendant also resided—while the children were living elsewhere with MW. The children had previously lived in BW's home until late 2015. Concerned over the girls' physical appearance, MW's classmate called the police.

Earlier that day, while defendant was at work, AW and her step-siblings apparently made some sort of mess in the house. When defendant arrived home, he became angry and began yelling at the children. AW testified that defendant "choked me and slapped me on the side of my head." She described the choking as "tightly pressing me against the wall and holding my neck and I couldn't breathe" and explained that defendant "was, like, bumping me really hard and I kept stepping back." AW also testified that defendant grabbed her neck tightly with one hand, and with his other hand open, slapped her "really hard" on the side of her face. CW testified that defendant pushed her into a television stand and that she thought defendant had hit AW with his hand on her neck. CW, however, testified that she did not "have really a good look" at what defendant had done to AW.

-1-

Dr. Dana Houghton, M.D., evaluated AW and CW and testified that AW told her that defendant had punched her in the head and choked her. Dr. Houghton described AW's injuries as follows:

> [S]he had some dried blood in the right naris without any associated septal hematoma, which is a collection of blood that's on the septum. She had some bruising around the anterior neck, as well as petechiae, which are very small hemorrhages around the eyes and across the bridge of the nose. Those petechiae extended down behind the angle of the mandible.

AW also had a bruised eye. Dr. Houghton testified that the petechiae and contusions on AW's neck were consistent with being choked.

Dr. Stephen Guertin, M.D., reviewed photographs of AW's injuries. According to Dr. Guertin, AW's injuries were consistent with being grabbed, throttled, or choked. Moreover, Dr. Guertin opined that the photographs revealed that AW had been struck in the ear or had been tossed, hitting her ear in the process. Dr. Guertin testified that the "constellation of injuries" indicated that AW's injuries were not accidental.

According to defendant, AW's injuries were self-inflicted. Defendant's first witness, another man who lived in BW's house, testified that he saw defendant "discipline, not beat," AW and CW. The man further testified that defendant smacked the girls "on their clothed behind wearing snow coats three times." Similarly, BW testified that she and defendant "spanked them three times on the butt, and had them stand by the door."

The prosecutor also introduced evidence of two prior acts of domestic violence. The first prior act occurred in January 2014. Trisha Ballard, who lived on the same street as defendant, recounted that she observed defendant with a little boy outside. According to Ballard, it was cold outside and the boy was wearing shorts. Ballard testified that defendant forced the boy to run up and down the street while barefoot. Once defendant took the boy inside the home, Ballard "heard a blood curdling scream come from the little boy and a loud smack," and she called 911. Lansing Police Officer Thomas Winarski responded to defendant's house that night, and he testified that his police report indicated that the boy had taken his father's drink and was being punished for this. Defendant had taken the boy outside because he had thrown a fit, and defendant had held him over a snowbank and told him if he did not calm down he would throw him in the snowbank.

The second prior act occurred in April 2014. Ballard testified that she observed defendant "dragging one of the little girls by one arm down the sidewalk." According to Ballard, defendant then threw the girl across the yard. Another witness, Annette McPherson, testified that on that day she saw defendant yelling at the little girl on the sidewalk and saw him "take his hand . . . and swat her in the back of the head, and she flew forward onto the sidewalk onto her hands and knees." McPherson called the police, and Lansing Police Officer Kristi Pratl responded to the house. Officer Pratl testified that the child "was kind of crying and acting as if she was in pain," and that she had "a little bit of scraping on her hands" and a "little bit of bruising and scraping to her knees."

The trial court instructed the jury that it could not convict defendant "solely because you think he is guilty of other bad conduct," but only if the evidence as a whole convinced it beyond a reasonable doubt that defendant was guilty of the charged crimes. The jury found defendant guilty of second-degree child abuse and assault by strangulation. The trial court sentenced defendant to serve 60 to 120 months in prison for second-degree child abuse and 30 to 120 months in prison for assault by strangulation.

This appeal followed.

## II. ANALYSIS

*Other-Acts Evidence.* On appeal, defendant first argues that the trial court erred by admitting evidence of prior acts of domestic violence. "A trial court's decision to admit evidence will not be disturbed absent an abuse of discretion. An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes." *People v Brown*, ___ Mich App ___, ___; ___ NW2d ___ (2018) (Docket No. 339318); slip op at 3 (cleaned up).

Under MCL 768.27b(1), "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other acts of domestic violence is admissible for any purpose for which it is relevant, if it is not otherwise excluded under Michigan rule of evidence 403." MCL 768.27b(5)(a) defines "domestic violence" to mean:

> an occurrence of 1 or more of the following acts by a person that is not an act of self-defense:
>
> (*i*) Causing or attempting to cause physical or mental harm to a family or household member.
>
> (*ii*) Placing a family or household member in fear of physical or mental harm.
>
> * * *
>
> (*iv*) Engaging in activity toward a family or household member that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested.

"Family or household member" includes an "individual with whom the person resides or has resided." MCL 768.27b(5)(b)(*ii*).

It is not contested that the children subject to defendant's aggression lived in the same household as him at times. The other-acts evidence tended to show defendant's attempts to cause physical harm to these children and was admitted at a proceeding where the jury was charged with determining whether defendant physically assaulted a child who formerly lived in his household. Thus, the evidence was admissible under MCL 768.27b and relevant to the extent

that it tended to make more likely defendant's abuse of the current victim. MRE 401. Accordingly, the only avenue by which the evidence may have been excluded is MRE 403.

"Exclusion is required under MRE 403 when the danger of unfair prejudice substantially outweighs the probative value of the evidence." *Brown*, ___ Mich App at ___; slip op at 3 (cleaned up). Given that multiple witnesses, including two police officers, testified to the other-acts evidence, there was substantial evidence from which the jury could conclude that defendant actually committed the other assaults. See *People v Watkins*, 491 Mich 450, 487-488; 818 NW2d 296 (2012). Moreover, the other-acts occurred within an approximate two-year span of the charged act. See *id*. The other-acts evidence tended to show that defendant would lose his temper and aggressively and physically discipline his housemates' children. The evidence was therefore highly relevant to show that defendant lost his temper on this occasion and aggressively and physically disciplined AW. See *id*. Although the evidence was prejudicial, it was not unduly prejudicial. Indeed, the trial court properly instructed the jury that it could not convict defendant solely on the basis of the other-acts evidence, thereby minimizing the risk that the jury would consider the evidence for an improper purpose. *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2011). Thus, we conclude that MRE 403 did not warrant exclusion of the other-acts evidence. Defendant's argument is without merit.

*Sufficiency of the Evidence.* Defendant next argues that the prosecutor presented insufficient evidence to support the convictions. Challenges to the sufficiency of the evidence are reviewed de novo. *People v Solloway*, 316 Mich App 174, 180; 891 NW2d 255 (2016). The reviewing court must determine if, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could find that the prosecution proved each essential element of the crime beyond a reasonable doubt. *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012). A trier of fact may consider circumstantial evidence and all reasonable inferences that evidence creates. *Solloway*, 316 Mich App at 180-181. "It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Flick*, 487 Mich 1, 24-25; 790 NW2d 295 (2010) (cleaned up).

A defendant is guilty of second-degree child abuse if he "knowingly or intentionally commits an act likely to cause serious physical or mental harm to a child regardless of whether harm results." MCL 750.136b(3). "Serious physical harm" refers to "any physical injury to a child that seriously impairs the child's health or physical well-being." MCL 750.136b(1)(f). A defendant is guilty of assault by strangulation if he intentionally impedes the "normal breathing or circulation of the blood by applying pressure on the throat or neck or by blocking the nose or mouth of another person." MCL 750.84.

The evidence was sufficient to support defendant's convictions. AW testified that defendant "choked me and slapped me on the side of my head." She described the choking as "tightly pressing me against the wall and holding my neck and I couldn't breathe." AW's testimony was corroborated by her sister and two medical experts testified that AW's injuries were consistent with being choked and struck or thrown. Indeed, the contusions and petechiae indicated that defendant was restricting AW's normal blood flow, causing her blood vessels to rupture. Although AW did not actually suffer a life-long physical impairment from the assault, the extent of her injuries shows that a serious impairment was likely from defendant's choking of

her. The evidence was therefore sufficient to support defendant's convictions for second-degree child abuse and assault by strangulation.

*Judicial Impartiality*. Defendant next argues that the trial judge's conduct pierced the veil of judicial impartiality and unduly influenced the jury's verdict. Criminal defendants have a right to a fair and impartial jury trial. *People v Stevens*, 498 Mich 162, 170; 869 NW2d 233 (2015). "A trial judge's conduct deprives a party of a fair trial if a trial judge's conduct pierces the veil of judicial impartiality." *Id*. at 170-171. "A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *Id*. at 171.

Having reviewed the record, we cannot conclude that the trial judge pierced the veil of judicial impartiality. On balance, the trial judge's comments appear to be attempts to control the proceedings in his courtroom and the admission of evidence and do not show bias towards either party.

For example, defendant argues that the trial judge's partiality is evidenced by the following exchange with one of his witnesses, George Smith:

> *The Court:* Let me ask you a question. We don't want your opinions.
>
> *The Witness:* I know that.
>
> *The Court:* Then stop giving them.
>
> *The Witness:* Okay.
>
> *The Court:* Just answer the questions. You got that?
>
> *The Witness:* I was asked if it was okay if they used me as a reference to spank the children, and I said they could use it—
>
> *The Court:* Mr. Smith, you were not asked this. No one asked you to volunteer this kind of information. You were told not to and now you go ahead and do it anyway.
>
> *The Witness:* You asked me what I was asked and I am telling you.
>
> *Defense Counsel:* Mr. Smith—
>
> *The Court:* Stop. Mr. Smith, if you continue along this path your testimony will end.

Taken in context, the record shows that the trial judge was trying to prevent the erroneous admission of evidence that could unduly prejudice the jury. Before the trial judge made the remarks at issue to Smith, defense counsel asked Smith a question to which Smith began to answer, but deviated from his direct response to state that "I was already told I can't say things,

which doesn't make sense. . . . Which is weird because . . . ." At that point, the trial judge interjected to prevent Smith from testifying about his own opinions on evidentiary issues in an attempt to sway the jury. The trial judge's comments prevented a lay witness from improperly orating and do not evidence any bias.

Similarly, defendant argues that the trial judge's partiality was demonstrated by the following exchange with defense counsel:

> *The Court:* If this is for impeachment, you do not have to necessarily show it to her. You can read it into the record and ask her if she said it. You can do it either way you want, but refreshing recollection, everybody seems to think that's the magic tool. It's not.

> *Defense Counsel:* I can do it however the Court prefers.

> *The Court:* No. I am not preferring anything. I don't think anybody knows evidence anymore. You can read.

> \* \* \*

> *Defense Counsel:* Objection, Your Honor. I am going to ask that the next two lines be read if this is going to be refreshing.

> *The Court:* I believe that if she doesn't introduce something that you feel is applicable, you can do that. Didn't you know that?

This exchange does not indicate any bias. Rather, it shows an attempt to control the admission of evidence in accordance with the rules of evidence. Moreover, review of the entire record confirms that the trial judge made similar remarks to the prosecutor and prosecution witnesses. While the trial judge could have used less acerbic language and tone, we conclude that, on balance, the trial judge's comments do not indicate any bias for or against defense counsel. Defendant's claims of judicial partiality are without merit.

*Ineffective Assistance of Counsel.* Finally, defendant argues that he received ineffective assistance of counsel by his trial attorney's failure to exercise a peremptory challenge with respect to a juror, a physician who knew Dr. Guertin. An appellate court is required to reverse a defendant's conviction when defense "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v Washington*, 466 US 668, 687-88; 104 S Ct 2052; 80 L Ed 2d 674 (1984). A defendant requesting reversal of an otherwise valid conviction bears the burden of proving "(1) the performance of his counsel was below an objective standard of reasonableness under prevailing professional norms and (2) a reasonable probability exists that, in the absence of counsel's unprofessional errors, the outcome of the proceedings would have been different." *People v Sabin (On Second Remand)*, 242 Mich App 656, 659; 620 NW2d 19 (2000).

During jury selection in this case, juror number seven indicated that he was a physician at Sparrow Hospital and that some of the witnesses in the case were familiar to him, particularly Dr. Guertin and Dr. Houghton. Nonetheless, through extensive questioning by defense counsel

and the trial court, juror number seven stated several times that he could be a fair, conscientious juror. Thus, it was reasonable to conclude that defense counsel believed that juror number seven would not be biased against defendant. Thus, defendant has failed to show that defense counsel's decision not to exercise a preemptory challenge on this juror fell below an objective standard of reasonableness. Defendant's claim of ineffective assistance is without merit.

Affirmed.

/s/ Brock A. Swartzle
/s/ David H. Sawyer
/s/ Amy Ronayne Krause